**In the Matter of James B. HUGGINS, Karen L. Huggins, Debtors.**

**No. 00–83596–JAC–7.**

United States Bankruptcy Court,
N.D. Alabama,
Northern Division.

Nov. 13, 2003.

Order Granting Rehearing Jan. 15, 2004.

James C. Francis, Decatur, AL, for Debtors.

Tazewell T. Shepard, Tazewell Shepard, P.C., Huntsville, AL, for trustee.

**64**

David H. Marsh, Susan J. Silvernail, Marsh, Rickard & Bryan, Birmingham, AL, for trustee as special counsel.

Judith Thompson, Huntsville, AL, trustee.

Linda A. Friedman, Bradley, Arant, Rose & White, Birmingham, AL, Vincent Cox, Louis P. Petrich, Leopold, Petrich & Smith, Los Angeles, CA, for defendants.

## ORDER

JACK CADDELL, Bankruptcy Judge.

On July 2, 2003, this matter came before the Court on trustee's motion to reopen the above styled case to pursue a prepetition cause of action, an undisclosed copyright suit, that the debtor, James Huggins, filed in the United States District Court for the Central District of California, *James B. Huggins v. Beacon Communications, LLC, et al.,* Civil Action No. CV–03–2484–ABC (CTX) approximately nine months after the debtors received their bankruptcy discharge. On July 3, 2003, this Court entered an order granting the trustee's motion to reopen the above styled case to pursue the lawsuit for the benefit of all creditors.

On October 29, 2003, the Court held a hearing on the trustee's motion for leave to supplement the record and on the Court's order to show cause. Based upon the newly discovered evidence presented at the hearing the Court hereby adopts the proposed findings of facts submitted by Beacon Communications, LLC, Beacon Communication Corporation and Universal Studios:

1. From 1993 until September, 2000, James Byron Huggins ("Huggins") was a credited author of a succession of novels. Works written by him included the novels "A Wolf Story," published in 1993, "The Reckoning," published in 1994, "Leviathan," published in 1995, "Cain," published in 1997, and "Hunter," published in 1999.

2. In addition to authoring published works that have been registered for copyright between 1993 and 2000, Huggins also authored a variety of draft screenplays, novels, and film and television treatments, including, but not limited to, works entitled "Nightbringer," "Scam," "Cain," "Hunter," and "Rora."

3. Huggins had seen the movie "END OF DAYS" by June, 2000, and claims to have believed that "END OF DAYS" infringed his copyright in "Cain."

4. During August, 2000, Huggins' agent, Daniel Stoecker, had submitted Huggins' screenplay, "Cain," to numerous production companies in an attempt to sell the screenplay. In late August or early September, 2000, Huggins told Stoecker that Huggins was in discussion with parties about copyright infringement issues associated with his story "Cain" and the film "END OF DAYS." Huggins told Stoecker at that time to pull "Cain" from the marketplace. As a "consolation prize" for pulling "Cain" from the marketplace, Huggins offered Stoecker an option agreement for Huggins' "Hunter" property.

5. Huggins filed a Petition for Bankruptcy pursuant to Chapter 7 of the Bankruptcy Act on September 25, 2000.

6. Prior to filing his Petition for Bankruptcy, Huggins was aware that he owned a treatment called "Nightbringer." Approximately one week after filing for bankruptcy, Stoecker and Huggins entered into a letter of agreement dated October 3, 2000, regarding "Nightbringer," which set the terms for their future exploitation of the work.

7. Huggins was aware at the time he filed his bankruptcy petition that "Nightbringer" could have substantial

monetary value. On October 19, 2000, he wrote to his agent, Daniel Stoecker:

"Dan, Holly has a major coup. Howard Kasagian wants to see 'Nightbringer.' He's a big fan of mine. Here is the new proposal. She's calling you this morning. If Howard likes it, *we'll have cash NEXT WEEK.* Get it to him today, hell or high water. Byron."

One hour later, he directed a second facsimile message to Daniel Stoecker, saying:

"Dan, Howard is huge fan of mine. *HUGE.* If he likes this, if you *pitch it* right, it's a *DEAL* with *INSTANT MONEY.* He would be a great mentor. For the love of God, don't fuck this up. Byron."

8. Prior to filing for bankruptcy, Huggins wrote a screenplay entitled "Rora," which he registered with the Writers Guild of America, West, on April 21, 2000. Huggins was aware prior to filing bankruptcy that "Rora" had substantial value, both in itself, and as a work which could be licensed for the creation of derivative works such as novels.

9. Huggins entered into an agreement with Lions Head Publishing ("Lions Head") on December 4, 2000, pursuant to which he granted to Lions Head the right to publish a novel to be based upon the pre-existing work "Rora" in exchange for an advance payment of $25,000 upon signing of the contract, and $5,000 per month until the manuscript was approved, with advance royalties to total $50,000.00.

10. Huggins manifested the extent of his awareness of his ownership of valuable rights in copyrighted works by providing a listing of some of his properties to Daniel Stoecker in a fax dated January 17, 2001.

11. Huggins met with his present lawyer, David Marsh, in November, 2000 to discuss bringing a copyright infringement claim against the producer and distributor of the motion picture "END OF DAYS." There is no explanation in the record as to whether or not Huggins previously consulted other attorneys regarding the claim, except that Huggins told Stoecker in late August or early September of 2000 that he had been talking to people about bringing a copyright infringement claim against people associated with the motion picture "END OF DAYS."

12. On August 29, 2000, the William Morris Agency sent a check for $1,684.07 to James Byron Huggins, representing the amount due Huggins for "Hunter" royalties arising from Books On Tape.

13. On January 11, 2002, the William Morris Agency sent a check to James Byron Huggins in the amount of $4,309.31, representing royalties due to Huggins for the Japanese edition of "Hunter."

14. On May 1, 2001, the William Morris Agency sent a check to Huggins in the amount of $520, representing an advance due on signing for the Bulgarian edition of "Hunter."

15. Within the week prior to filing his Petition for Bankruptcy, Huggins met with his bankruptcy attorney, James Francis. He discussed with Francis the portion of the bankruptcy petition requiring him to identify any intellectual property and any causes of action he had an interest in. Huggins fully understood that he was under a legal obligation to disclose the existence of any valuable or potentially valuable copyrights or claims when he signed his bankruptcy petition.

16. Huggins did not identify any copyrights, royalty interests, or contingent claims of any nature in his bankruptcy petition, despite the fact that he was fully aware that he owned several copyrights, royalty interests, and a contingent claim for copyright infringement against the producers of the film "END OF DAYS." He did not disclose to the bankruptcy trustee any of the proceeds that he received for any of his copyrights at any time after filing the Petition for Bankruptcy. He did not take any steps to amend his petition or reopen the bankruptcy until 2003, after defendants in a copyright suit brought by Huggins raised the bankruptcy as one of their defenses to Huggins' claims.

■■■ Based upon the foregoing, the Court finds that the debtor is hereby judicially estopped from pursuing the copyright claims that he intentionally failed to disclose in his bankruptcy petition. The doctrine of judicial estoppel precludes a party from "asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."[1] In *Barger v. City of Cartersville, Georgia (In re Barger)*, 348 F.3d 1289 (11th Cir.2003), the Eleventh Circuit held that the key factors in determining judicial estoppel are: (1) a party's allegedly inconsistent positions must have been made under oath in a prior proceeding, and (2) the inconsistencies must be shown to have been calculated to make a mockery of the judicial system. There is no doubt that the first factor has been satisfied by the debtors failure under oath to disclose the lawsuit as an asset in his bankruptcy schedules. The Court further finds that the debtor's inconsistent position was calculated to make a mockery of the judicial system. The debtor's motive is clear. By omitting the copyright suit from his schedules, the debtor was able to obtain a complete discharge of his debts in Chapter 7 while keeping the potential proceeds from the copyright suit for himself. The debtor knew that he had a prepetition asset that was worth potentially millions of dollars. He began to pursue the lawsuit while his Chapter 7 case was pending, filed the lawsuit nine months after he received his Chapter 7 discharge and had motive to conceal the asset. Hence, the Court finds that the debtor intentionally failed to disclose this asset and is judicially estopped from asserting any recovery from same now.

The Court is inclined to allow the debtor's Chapter 7 trustee to proceed with the civil action for the benefit of the creditors with recovery limited to the amount of debt scheduled herein, $262,650.57, plus the reasonable costs and expenses incurred by the trustee and special counsel to pursue same. The Court recognizes, however, that pending before the Eleventh Circuit is a case, *Parker v. Wendy's International Inc., et al.*, CV–99–N–0038–S, in which the court has been asked to decide whether a Chapter 7 trustee is barred from asserting a cause of action based on the debtor's failure to disclose the cause of action. The Court will delay ruling on this matter for a period of approximately 60 days to see if the Parker decision is forthcoming.

It is therefore ORDERED, ADJUDGED and DECREED that this case shall be reset for hearing on January 14th, 2004, at 9:00 a.m. in the U.S. Courthouse, Federal Building, Cain St. Entrance, 3rd Floor Courtroom, Decatur, Alabama 35601.

1. *Barger v. City of Cartersville, Georgia (In re Barger)*, 348 F.3d 1289, 1293–94 (11th Cir. 2003).

## ORDER CONDITIONALLY GRANTING REHEARING

This case is before the Court on rehearing on trustee's motion to reopen case. On November 13, 2003, this Court entered an order finding consistent with the Eleventh Circuit's decision in *Barger v. City of Cartersville, Georgia (In re Barger)*, 348 F.3d 1289 (11th Cir.2003) that the debtor was judicially estopped from pursuing certain copyright infringement claims filed in the United States District Court for the Central District of California, *James B. Huggins v. Beacon Communications, LLC, et al.*, Civil Action No. CV–03–2484–ABC (CTX).

The trustee still argues that this case should be reopened to allow him to pursue the cause of action on behalf of the estate and that the judicial estoppel against the debtor should not apply against the trustee. The Court delayed ruling on the matter for a period of sixty days because the Eleventh Circuit Court of Appeals has been asked to decide this very question, *Parker v. Wendy's International Inc., et al.*, CV–99–N–0038–S (2003), but as of the date of this order the *Parker* case remains under submission. The defendants in the *Parker* case have also raised other procedural issues upon which the case may well be decided and so the issue of judicial estoppel against the trustee may not be reached.

Therefore, this Court decides and orders that the case may be reopened and that the debtor's judicial estoppel does not estop the trustee. The reopening of the case and the trustee's authority to proceed with the cause of action in the Central District of California however, is conditioned on the following: *any recovery sought by the trustee is hereby limited to the amount of the proofs of claim filed in this case, reasonable attorney fees and reasonable expenses incurred by the trustee and special counsel to pursue the civil action, and other administrative expenses in the case.*

This opinion shall be withdrawn if the Court of Appeals decides the *Parker* case adversely within ten days from its entry.

It is therefore ORDERED, ADJUDGED and DECREED that the trustee's motion to reopen is hereby conditionally granted as set forth above.